## NELSON McCRACKEN vs. GREEN D. TODD et al.

There being no provision in any treaty with the Delaware Indians to the contrary, the lands of that tribe, within the boundaries of Kansas, are included within its limits and jurisdiction.

The act of congress organizing the territories of Kansas and Nebraska, by implication, repeals the act of June 30th, 1854, regulating intercourse with Indians, so far as it prohibits settlement by foreigners, and manufactures by or commerce among persons not belonging to Indian tribes, and not on land of such tribes.

From the date of the cession of the Delaware " trust lands," and of the " outlet," (July 17th, 1854,) these lands and their occupants (not Indians) became subject to the laws of congress, as other lands in Kansas, and their occupants, except as the treaty contained provisions of special and local application to them.

The only provisions in the treaty, ceding those lands of such local and special application, are article two, by which the government agrees, for pre-emptors, to offer the " trust lands " at public auction, and the provision, in article sixteen, extending, *so far as applicable,* to the lands ceded in the treaty, the act of March 3d, 1807, which prohibits any person making settlement on any land secured to the United States by any treaty made with a foreign nation, or by a cession, by any state, which lands shall not have been previously disposed of by the United States, and which prohibits the surveying, without authority of law, of any such lands.

The act of March 3d, 1807, was not in full force over the other lands of the United States in Kansas.

These provisions of treaty and law prohibit only *settlement* or *survey,* and not the passage to and fro by any person over these lands, nor do they prohibit the government, whether of the territory, or of any of its political subdivisions, from establishing its offices, holding its courts and issuing and executing its processes at any place upon them.

The process of all the courts of the territory could have been legally executed anywhere within the limits defined by the territorial laws, whether on the Indian or military tracts, except, only, on those Indian reservations excluded by express treaty stipulation, from the limits or jurisdiction of the territory ; and the state has like power, subject to the laws of the state, within the limits defined by the state laws, except, only, on those Indian reservations, in like manner, excluded from the limits of the state, by treaty provisions in force at the date of the admission of Kansas into the Union.

A petition, alleging that a writ " was issued out of and under the seal of the court," *held,* sufficient on demurrer, although, by the copy of the writ set

forth in the petition, it appears to have no seal. The fact that the writ had no seal must be taken advantage of by answer.

An official bond of a sheriff, with a condition, in substance and legal effect, like the one prescribed by statute, *held* to be a statutory bond.

The purpose of the law (of 1855) in requiring the action of the probate court upon the bond of a sheriff, was to secure those who might suffer by the sheriff's official defaults or misconduct. *Held,* that the sureties on a sheriff's bond cannot take advantage of an omission to have the bond approved and its amount prescribed by the probate court, where the amount is within the statutory limits. The deposit of such bond for record *held* to be a delivery.

A sheriff, under the laws of 1855, held the office from the date of the acceptance of his commission. Neglect to have it approved did not vacate the office, and his official acts were binding and effectual.

The thirteenth section of the act of 1855, (*p*, 713) conferring on the sheriff "all the authority, power and privileges usually conferred on officers of a similar character," allowed a sheriff, as under the common law, to depute a person who was not and could not even have been appointed a general deputy, to do a specific official act.

The appointment of a person as deputy, and delivery of a writ of attachment to him by the sheriff, are sufficient authority for serving the writ, and official acts done under such an appointment are binding on the sheriff.

This case was tried in the district court of Leavenworth county, territory of Kansas, before Pettit, C. J.

The petition showed the appointment of defendant Todd, to the office of sheriff of Leavenworth county, his giving of an official bond with his co-defendants as sureties, the record of the bond in the "book of official bonds" of Leavenworth county, and gave a copy of the condition of the bond. The condition did not use the words specified in the statute. The petition further alleged the appointment by Todd, as under sheriff, or deputy, of one McMeekin, but did not allege that McMeekin's appointment was approved by the probate court, as required by the statutes of 1855. (§ 1, *p*. 713.)

The petition further showed the sueing out of a writ of attachment by one Young, against the plaintiff, McCracken; that the same was issued under the seal of the court, but the copy of the writ, given in the petition, showed no seal; that the same was executed by said deputy, McMeekin, by attach-

ing plaintiff's property ; that on the trial of the suit between said Young and McCracken, a judgement was rendered in favor of McCracken and against said Young, and the issuance of an order to the sheriff, Todd, directing him to return to the said McCracken the goods and chattles taken on the writ of attachment; that the sheriff failed to return the property attached, and that plaintiff was greatly injured thereby.

To this petition defendants interposed a general demurrer, which was sustained by the court, and plaintiff excepted, and filed his petitition in error in the supreme court to reverse the judgment of the district court.

*Gambeil, Adams and Ludlum,* for plaintiffs in error.

I. It is objected that the bond was not approved by the probate court. It is not for the defendants to make the objection. The provisions of the statute of 1855 were intended for the benefit of third persons, and have no connection with the liabilities of the principal and his sureties. The statute is directory to the officer himself, and neither he nor his sureties can take advantage of a want of compliance therewith.

(*Dutton vs. Kelsey et. al.,* 2 *Wend.,* 615.) Dutton sued Kelsey, a constable, and his sureties, for not collecting an execution put into his hands, as constable, and obtained judgment. Defendant appealed. At the trial in the common pleas, plaintiff produced the constable's bond, dated March 7th, 1837, which was approved by the supervisor the same day, and filed in the town clerk's office, July 27th, 1837. The common pleas nonsuited plaintiff, judgment was entered and plaintiff appealed.

Savage, C. J., delivering the opinion of the court, (*p.* 616,) said : " Another objection taken, was, that the security was not filed in due time. This comes with an ill grace from the defendants. It was the constable's duty to file it within ten days after the election. *The statute is directory,* merely, and

if not complied with, it by no means follows that the defendants are exonerated."

(*Skellinger vs. Yendes*, 12 *Wend.*, 306.) Skellinger sued Yendes, and his sureties, on a constable's bond, for not returning an execution put into his hands for collection, obtained judgment, and defendant appealed to common pleas. On the trial in that court, plaintiff produced the bond, on which *no approval of the sureties* was indorsed. Defendant objected that the bond was not a valid instrument, and plaintiff was nonsuited.

Savage, C. J., (*p.* 309.) The statute declares that the bond shall be filed within ten days after the election, and *before the constable enters upon the duties of his office ;* yet the bond has been held good, though not filed within ten days ; and it cannot be doubted that the constable himself would be responsible for any act done by him *before filing* the bond. The statute being *directory* to the officer himself, he cannot take advantage of his own omissions. Nor is there any reason why the *sureties* should not be liable, notwithstanding the want of compliance with the statute provisions. In this case it seems that the town clerk neglected to indorse his approval of the sureties. That provision was intended for the benefit of those who should put executions into the hands of the constable, *and has no connection with the liability of the sureties. Their signature was all that was necessary to make them liable.* If the bond was not approved and filed, the omission might be considered a refusal to serve, and the vacancy might be filled ; but there is nothing in the language or policy of the statute which renders void *any* instrument executed for the security of execution creditors.

(*Ring vs. Gibbs*, 26 *Wend.*, 502.) Action on bond executed by defendants to obtain release of a ship from arrest, under the New York statute, authorizing summary proceedings against ships. It was claimed that the bond, not being approved by the commissioner, as by law required, was void.

The supreme court say, (*p.* 505): "It does not lie with the defendants to object that the surety was not approved of by the commissioner. The waiver of approval was injurious to the plaintiff, if anybody." And the court of errors (*p.* 509) held "that the variance of the condition from the terms of the statute" did not render the bond void.

(*Maupleman vs. Commonwealth,* 7 *Barr,* 246.) Action on constable's bond. *Held,* that the *sureties* could not object that the bond was not approved by the court, nor that the constable was not sworn.

(*Church vs. Clark,* 7 *Blackf.,* 570.) Debt on sheriff's bond. *Held,* that the defendants were not entitled to offer evidence of the approval of the bond by the judges, *the approval being no part of the bond.*

(*Westenhover vs. Clive,* 5 *Ham.,* 138.) The law of Ohio required the bond of a constable to be given in ten days after his appointment. *Held,* that the bond was not void which was given after that time.

(*Davis vs. Haydon et al.,* 3 *Scam.,* 35.) This was an action of debt on a sheriff's bond, for a breach of duty on the part of the sheriff, in failing to pay over taxes collected. The defendants pleaded that the bond was not presented to, or approved by, the judge of the circuit court of the county, at the next or any succeeding term thereof, as the law required.

It was *held,* Scates, J., that the plea was bad, and that the bond was valid until disapproved by the court; the *disapproval,* not the *want* of approval, would render the office vacant, but not the bond void. (*And see further on this point,* 4 *U. S. Digest,* 317, 318, 319; 11 *Wheaton,* 184; 12 *Wheaton,* 64.)

A bond, if void as a statutory bond, is valid as a commno law bond. (1 *Kelly,* 258.)

II. The bond described in this declaration is a legal and valid bond, upon which the defendant, Todd, and his sureties are liable.

McCracken *v.* Todd.

1. The territorial legislature had the right to organize the county of Leavenworth, to create the office of sheriff, to provide for his election, and to require a bond to be given. (*Bright. Dig., p.* 451, §§ 7, 8.)

2. The legislature did organize Leavenworth county, created the office of sheriff, provided for his election, prescribed his duties, and required a bond to be given. (*Stat.* 1855, *p.* 712, §§ 1 *to* 6, *inclusive.*)

3. The legislature of 1855 elected Todd to the office of sheriff. He gave the bond, conditioned as prescribed by law, and entered upon the discharge of the duties of his office.

4. And the defendants are estopped from denying the legality or regularity of Todd's election. If third persons might make these objections, it does not follow that defendants may. (1 *Greenlef's Ev.*, §§ 192, 207, *and cases cited in notes; 5 U. S. Digest,* 466; *Hughes vs. James,* 3 *J. J. Marshall,* 700.)

III. The position that the territory embraced within the limits of Leavenworth county formed no part of the territory of Kansas, is wholly untenable.

1. The organic act provides that "all that part of the territory of the United States, included within the following limits, except such portions thereof as are hereinafter expressly exempted from the operation of this act, to-wit: Beginning at a point on the western boundary of the state of Missouri, where the thirty-seventh parallel of north latitude crosses the same; thence west on said parallel to the eastern boundary of New Mexico; thence north on said boundary to latitude thirty-eight; thence following said boundary westward to the east boundary of the territory of Utah, on the summit of the rocky mountains; thence northward on said summit to the fortieth parallel of latitude; thence east on said parallel to the western boundary of the state of Missouri; thence south with the

western boundary of said state to the place of beginning, be, and the same is hereby created into a temporary government by the name of the territory of Kansas." (*Brightley's Digest. p.* 449, § 1.)   This included the lands contained within the limits of Leavenworth county.

2. But it is claimed by the defendants that these lands are excepted out of the boundaries of the territory, by the terms of the second proviso in section one of the organic act, above quoted, which is as follows: "Provided, further, that nothing in this act contained shall be construed to affect the rights of person or property now pertaining to the Indians in said teraitory, so long as such right*s* shall remain unextinguished by treaty between the United States and such Indians, or to include any territory which, *by treaty with any Indian tribe,* is not, without the consent of said tribe, to be included within the territorial limits or jurisdiction of any state or territory; but all such territory shall be excepted out of the boundaries and constitute no part of the territory of Kansas, until such tribe shall signify their assent to the president of the United States to be included within the said territory of Kansas."   The plain language of this proviso is against the position taken by the defendants and sustained by the court below.   There is no provision in any treaty between the Delawares and the United States saying that the territory embraced within the limits of Leavenworth county shall not, "without the consent of the tribe, be included within the territorial limits or jurisdiction of any state or territory."   And unless there is such a provision in some treaty with the Delawares, these lands are included within the limits of the territory of Kansas, by the very terms of the organic act.   There is but one Indian treaty, we believe, which contains such a clause, and that is the treaty with the Osages. .

3. But conceding that these lands were excluded by the terms of the organic act, then we say that the same lands

were ceded by the Delawares to the United States before Leavenworth county was organized, and before Todd's election as sheriff. By this cession, these lands became the property of the United States. (*See U. S. Statutes at Large, vol.* 10, *p.* 1048.) At all events, this act amounted to an assent, on the part of the Delawares, if indeed any assent was necessary, that these lands should be included within the limits, and should form a part of the territory.

IV. It is claimed by the defendants in error that the bond is void, because the settlement upon those lands, and the organization of Leavenworth county therefrom, were in violation of the treaty of cession, concluded May 6, 1854.

1 But there is nothing in this treaty which prohibits the settlement of these lands, or the organization of counties therefrom. (*U. S. Statutes at Large, vol.* 10, *p.* 1048.) Article first cedes the lands. Article second provides how the lands ceded shall be disposed of. Article third provides for the payment to the Delawares. Article sixteenth is as follows: "It is agreed by the parties hereto that provisions of the act of congress approved 3d March, 1807, in relation to lands ceded to the United States, shall, *so far as applicable,* be extended to the lands herein ceded." The act of 1807 will be found in *Brightley's Digest,* (*p.* 487.) Section one hundred and seventy-three of this act is supposed, by the defendants in error, to have been violated by the settlers upon these lands. It prescribes a penalty for intrusion on the public lands of the United States. The intruders forfeit all right, claim and title to the lands of which they have taken possession, and are liable to be removed by force. Granting that this section is applicable to the lands in question, what then? The intruders were liable to the penalty which the law imposed.

2. But this section was not applicable to these lands to the extent claimed by the defendants in error, at the time

these settlements were made, and the county was organized. The treaty was concluded May 6th, 1854. The bill organizing the territory was not approved until May 30th, 1854. After that, a Governor for the territory, and other officers, were sent here by the federal government, people came from all parts of the country, a portion of them settled upon these lands, and continued in possession of them up to the time of sale by the United States, in 1856, after the lands had been advertised for sale, as required by law. The federal government suffered them to remain there without molestation, and made no attempt to remove them, allowed them to retain the improvements they had made on the land, &c. &c. This section of the act of 1807, if ever applicable to these lands, then became obsolete. (*See U. S. vs. Cisna,* 1 *McLean,* 254.) In this case it was held that where the country adjacent to an Indian reserve had become so thickly settled as to render it impracticable to execute the intercourse laws, such laws became obsolete; and the federal jurisdiction over offenses committed on such reserves ceased; that it was immaterial whether the intercourse laws were expressly repealed or *rendered inoperative by the force of circumstances;* that it might be presumed, from circumstances, that the United States intended to abrogate the law.

3.  Again: The United States alone could complain of these trespasses, could remove the settlers, or allow them to remain. The Delawares could not be injured; they made no complaint. How then can the defendants in error complain for them, years afterwards, in this collateral manner? It was discretionary with the president whether he would remove these settlers, conceding that they were trespassers. (*See Public Lands, Laws, Instructions and Opinions, Part 2, p.* 272 *and* 422.)

4.  The territorial law extending jurisdiction over these lands is not in conflict with the act of 1807, nor with any

McCracken *v.* Todd.

provision of of the treaty.   The United States still had possession of the land.   The right of the territory, under the organic act, to extend her laws and jurisdiction over these lands, cannot be seriously questioned.   (*See Public Lands, Laws, Instructions and Opinions, Part 2, p.* 181; *Opinion of Att'y Gen. Taney in relation to the lands ceded by the Creek treaty of* 1832.)

5.   But it is idle to contend that this provision of the treaty was intended for the benefit of the Delawares.   The sole object was to enable the United States to remove trespassers and intruders, should it become necessary.

6.   If the doctrine laid down by the court below be the correct one, then every man who was present at the sale of these lands, for the purpose of buying, was a trespasser, and liable to be removed.

7.   But more than all this, this state of affairs was brought about by the acts of the federal government; and it recognized the legality of the very acts which the defendants in error now claim to have been illegal.   After the organization of the territory, the governor issued his proclamation for an election, which took place March 3d, 1855.   From Leavenworth county, two councilmen and three members to the house of representatives were elected. The legislature met at Pawnee, July 2d, 1855, organized and adjourned to the Shawnee Manual Labor School, where it assembled July 22d, 1855, and proceeded to enact the laws of 1855.   This legislature was recognized by the federal government, as well as the legality of the acts passed.   But it was left to the defendants in error, when sued upon their bond, to discover their illegality. (*See House Journal of* 1855.)

8.   In exercising this jurisdiction over these lands, the territorial legislature was doing nothing more than had before been done under the government of the territories, of which the territory embraced within the limits of Kansas

was a part.   Up to April, 1803, the civil code was in force in the territory of Louisiana.   By the act of congress, March 26, 1804, the then territory of Louisiana was divided into two districts, all south of the one hundred and thirty-third degree, north latitude, being called the "territory of New Orleans," and all north, the "district of Louisiana."   That act extends the executive power of the governor of Indiana over the "district of Louisiana," which embraced Kansas.   The governor and judges of Indiana were authorized to establish inferior courts, prescribe their jurisdiction and duties, and to make all laws which they might deem conducive to the good government of the inhabitants.   The governor and judges, in pursuance of these powers, did pass laws, &c.   By the act of 3d March, 1805, a territorial government was organized for the same territory, and the name changed to that of the "territory of Louisiana," and the legislative power was vested in the governor and three judges.   June 4th, 1812, the Missouri territory was organized, and the legislative power was vested in the governor, the council and house of representatives, and the territory was entitled to send a delegate to congress.   The legislature passed acts of a general nature, and adopted the common law as the law of Missouri.

V. A portion of the lands embraced within the limits of Leavenworth county, was not trust land, but was public land of the United States, open for settlement; and the fact that trust lands were also included, would not render void the organization of the county.

 1. Certainly, if, as was the case, there was public land on which people had a right to settle included within the limits of Leavenworth county, the legislature had jurisdiction over it, and could organize it into a county, &c.

 2. Does the mere fact that other lands over which, we will say, the legislature had no jurisdiction, were included

McCracken *v.* Todd.

within the limits of the county, render its organization void? We think not. There is no reason why the same principle would not apply in this case as in that of a grant of land, a portion of which is within the Indian country, and the balance of which is outside of it, and subject to sale. And in such a case the supreme court of the United States held that while the grant was void, as to the portion of land within the Indian boundary, it was valid as to the residue. (*See* 9 *Wheaton; p.* 673.)

VI. The whole question of the propriety, legality or regularity of the organization of Leavenworth county, is a political one, to be settled by the legislative and executive departments, and cannot be re-examined here.

1. In support of this position, we cite a few authorities. And while we do not claim that the cases cited are precisely in point, we think they are analogous in principle, (*Scott vs. Jones,* 5 *Howard, U. S., p.* 343.) In this case the question arose whether an act of the legislature of the state of Michigan, incorporating a company, was valid. It was climed that the state government had not, at date of act, been fully established—was not in legal force or operation. The court below held the act valid. In the supreme court it was held that the court had no jurisdiction over the appeal; but the court intimated that it was, a "mere political question, to be settled by the action of the other departments of the government, and not re-examinable in that court." (*The Cherokee Nation, vs. Georgia,* 5 *Peters, p.* 12) This was a case in which the Cherokee Nation filed a bill praying an injunction to restrain the state of Georgia from the execution of certain laws of that state within the Cherokee lands, which, it was contended, operated to annihilate the Cherokees as a political society, and to seize, for the use of Georgia, the lands of the Cherokees, which had been assured to them by treaties with the United States. The court first decides

that the Cherokees cannot sue in that court, and hence the court had no jurisdiction; secondly,. the court hold that if the court has jurisdiction, "the propriety of such interposition by the court may well be questioned." "It savors," says Marshall, C. J., page twenty, "too much of the exercise of political power to be within the proper province of the judicial department." Johnson, J., page twenty-eight: "I cannot entertain a doubt that it (the question) is one of a political character altogether, and wholly unfit for the cognizance of a ·judicial tribunal." Page thirty-one. "What these people may have a right to claim of the executive power is one thing; whether we are to be the instruments to compel another branch of the government to make good the stipulations of treaties, is a very different question. Courts of justice are properly excluded from all considerations of policy, and therefore are very unfit instruments to control the action of that branch of government which may often be compelled, by the highest considerations of public policy, to withhold even the exercise of a positive duty." (See opinion of Baldwin, J., p. 32. See also, Foster vs. Wilson, 2 Pet., 253; Garcia vs. Lee, 12 Pet., 511; U. S. vs. Arredardo, 6 Pet., 711.)

2. It appears from the action of the federal and territorial governments in the premises, that the same construction was by them given to the treaty and to the organic act for which the plaintiff in error contends. And it is a familiar principle of law, that, where the legislative and executive branches of a government have determined a matter proper for them to take cognizance of, the judicia tribunals will follow that determination. (See Garcia vs. Lee, supra.)

VII. Admitting that the act of settling upon the Delaware trust lands was a trespass, and that the settlers were wrongfully there, then we say that these facts do not render this bond void.

1. It is a well settled principle of law, that, if the illegal act is not the *consideration* of the contract, and is entirely disconnected from it, the *contract* is valid, although the *occasion for making* the contract arose out of the existence of the illegal act. (*Armstrong vs. Toler*, 11 *Wheaton*, 258; *Story on Contracts*, § 621; *Wetherell vs. Jones*, 3 *Barn. & Adolph*, 221; *Little vs. Poole*, 9 *Bar. & Cress.*, 200; *Story on Conflict Laws*, §§ 247 *to* 255; *McBlair vs. Gibbs*, 17 *Howard*, 232.)

2. The violation of the law, if any there was, had been committed before the agreement sued upon had been enteredinto. And it is well settled that if an act, in violation of either the statute or the common law, be already committed, and a subsequent agreement be entered into which, although founded thereupon, constituted no part of the original inducement or consideration of the illegal act, such agreement is valid. (*Armstrong vs. Toler*, 11 *Wheaton*, 1258, 271, 276; *The George*, 1 *Wheaton*, 408, and 2 *W.*, 278; *Tenant vs. Elliott*, 1 *Bos. & Pul.*, 3; *Cannan vs. Boyle*, 3 *Barn. & Ald.*, 179; *Story on Contracts*, § 622.)

3. The parties, at all events, supposed the act which formed the consideration of the contract to be legal; and if it turned out that it was actually illegal, the contract would, nevertheless, be good. (*Story on Contracts*, § 573; 2 *Johnson Cas.*, 56; *Coventry vs. Barton*, 17 *Johns.*, 142; *Avery vs. Halsey*, 14 *Pick.*, 174.)

4. And even a promise to indemnify against a trespass is good, unless the promisee knew the contemplated act to be a trespass. (*Stone vs. Hooker*, 9 *Cow.*, 154; *Allaire vs. Cleveland*, 2 *Johns. Cas.*, 52; *Avery vs. Holsey*, 14 *Pick.*, 174.)

VIII. The plaintiff in error shows in his petition a good cause of action.

11

1. He shows that Todd was duly elected to the office of sheriff of Leavenworth county; that he gave a bond as required by law; that he committed breaches of the condition of that bond, and that the plaintiff was damnified thereby.

2. His property was taken by this sheriff, upon a process issued out of a court established by competent authority, and that property was converted by this sheriff to his own use.

*Reese and Wheat*, for defendant Todd, submitted:

I. The bond of defendant Todd is void, because the condition is not in conformity with the statute. (*Stat.* 1855, *p.* 712.

II. The bond and commission are not complete, because not recorded as required by law. (§ 1, *Stat.* 1855, *p.* 712.)

III. The bond is void, because it was not approved by the probate court or judge. (*Stat.* 1855, § 1, *p.* 712.)

IV. McMeekin was no deputy, because he was not appointed in the mode prescribed by statute. (*Statute* 1855, § 6, *p.* 713.)

V. The writ of attachment was void for want of seal. (*Stat.* 1855, § 1, *p.* 767; *Bybee vs. Ashby*, 2 *Gilman*, 166.)

VI. The bond of Todd was void, because it was made on lands to which the Indian title had not been extinguished, all parties being trespassers, and the lands being excluded from, and joining no part of the territory; and the writ of attachment and all things done under it are void for the same reason. (*See* treaty with *Del. Indians, ratified May,* 1854 and *Org. Act,* § 19.)

VII. Defendant Todd was not sheriff until all the statutory requirements were complied with.

By the Court, EWING, C. J. Error from the district court for the first judicial district.

McCracken *v.* Todd.

This cause comes before us by petition in error asking reversal of judgment for defendants, rendered in the district court for Leavenworth county, in August, 1859. The exception is to the order of the court sustaining demurrer of defendants to the petition, and entering judgment thereupon against plaintiff for costs.

Counsel for defendants presented, among others, the following grounds of objection to the petition below, which give rise to all the questions to be considered by the court.

First. That the city of Leavenworth, in which was held the court when the proceedings in the case of Young *vs.* McCracken were had, (one of which proceedings the alleged cause of action in this case arose,) being on land belonging to the Delaware Indians at the date of the act organizing the territories of Kansas and Nebraska, was by that act excepted from the territory of Kansas, and therefore the proceedings were *coram non judice* and void.

The following provision in the first section of the above named law is relied on to sustain this position.

"*Provided, further:* That nothing in this act contained shall be authorized * * * to include any territory which, by treaty with any Indian tribe, is not, without the consent of such tribe, to be included within the territorial limits or jurisdiction of any state or territory; but all such territory shall be excepted out of the boundaries, and constitute no part of the territory of Kansas, until said tribe shall signify their assent to the president of the United States to be included withing the said territory of Kansas."

This ground of objection calls for no comment by the court, further than a statement that nowhere in any treaty with the Delaware Indians, is there a provision that the lands of that tribe shall not, without its consent, be included within the territorial limits or jurisdiction of any state or territory. All the lands of that tribe, within the boundaries specifically described in the first section of the law referred to, were, there-

fore, included within the limits and jurisdiction of the territory.

Second. That if the lands ceded to the United States by treaty with the Delaware Indians, of 1854, on which was the town of Leavenworth, were in the jurisdiction of Kansas, yet entry and settlement on them were forbidden when the proceedings in Young *vs.* McCracken were had, and that all the officers of the county and of the district court, and suitors there attending, were trespassers, their acts and proceedings void, and no liability could be incurred by the sureties by the execution and delivery of a bond there, or by service by the sheriff of process issued there by the court.

We need not question the position that the first section of the act of the 30th June, 1834, to regulate trade and intercourse with the Indians, declares, for the purposes of that act, all the territory west of the state of Missouri to be "the Indian country." But that act does not prohibit settlement, by persons not foreigners, on the lands in that country, except on those lands "belonging, secured or granted, by treaty with the United States, to any Indian tribe." (*See* § 11.) And so far as it forbids settlement by foreigners, or forbids any kind of manufacture by or commerce among persons not Indians, or belonging to Indian tribes—and not on the lands of the Indian tribes—to that extent, at least, its provisions were in conflict with the act organizing the territories of Kansas and Nebraska, and were, by that act, by implication, repealed. For the United States, when the act organizing the territory of Kansas was passed, had extinguished the Indian title to more than half the lands in Kansas, and by express provision in that act, made them subject to the pre-emption laws, and by establishing a complete system of government for the people, and opening the public lands to settlement, it invited and encouraged the formation of commercial and agricultural communities in Kansas, which could not have risen or existed,

McCracken v. Todd.

subject to all the rigorous prohibitions and penalties of the non-intercourse laws.

About two months after the act to organize the territory of Kansas, and on the 17th of July, 1854, the Delawares ceded to the United States the tract known as "the outlet," in consideration of the payment of ten thousand dollars, and also the tract known as the "trust lands," in consideration of a stipulation to pay them the net proceeds of the sale thereof. From the date of the cession, these ceded lands and their occupants (not Indians) became subject to the laws of congress precisely as the other public lands in Kansas, and their occupants were subject to them, except as the treaty contained provisions of special and local application to them.

The only provisions in the treaty of such special and local application are the provisions in the second article, by which the government agrees, without a saving clause for pre-emptors, to offer the trust lands at public auction; and the provision in the sixteenth article, that the act of third of March, 1807, (*Brightley's Digest, p.* 487,) should, "*so far as applicable,*" extend to the lands ceded in the treaty.

This act of 1807 provides that, "if any person or persons shall take possession of or make settlement on any lands ceded or secured to the United States by any treaty made with a foreign nation, or by a cession by any state to the United States, which lands shall not have been previously sold, ceded or leased by the United States, or shall survey, or cause to be surveyed, any such lands, or designate any boundaries thereon, by marking trees, or otherwise, until thereto duly authorized by law," such offender shall forfeit all his right, title or claim to such land, and be subject to be removed by the president. This act was not in full force over the other lands of the United States in Kansas, for it forbids these settlements on public lands, which the pre-emption laws, passed subsequent to it, expressly authorized. It was declared by the treaty, applicable to the " trust lands," apparently in

aid of the provision in the treaty, that those lands should be sold at public auction, in order to prevent settlements in advance of the sales, and the otherwise inevitable combinations of settlers to prevent free bidding:

We need not discuss the question whether the act of 1807 would have been applicable to settlers on the trust lands, without the sixteenth article of the treaty, or whether if it would not have been applicable, the treaty provision could give it effect. It will be seen that these provisions of treaty and law prohibit only *settlement* or *survey.* They do not, nor can they be construed to prohibit any person passing to and' fro over the lands so ceded, nor to prohibit the government, whether of the territory or of any of its political subdivisions, establishing its offices, holding its courts, and issuing and executing its process, at any place upon them. And if the act of 1807 could be construed as thus restraining the government, it would, to that extent, be, in the language of the treaty, "inapplicable," as in conflict with the act organizing the territory. (*See, specially,* § 35.)

Lest, by restricting our opinion to the question of the power of the territorial government to exercise its functions on the "trust lands," we occasion misconstruction, it may be well to say, further, that the process of all the courts of the territory could, undoubtedly, have been legally executed anywhere within the limits defined by the territorial laws, whether on the Indian or the military reservations—except, only, on those Indian reservations, in regard to which it is stipulated, by express treaty provision, in force and effect during the existence of the territory of Kansas, that they should not be included within the limits, or jurisdiction, of any state or territory. And that the state courts have like power, subject to the laws of the state, to execute their process on any Indian or government reservation within the limits defined by state laws, except, only, on such Indian reservations as were, in like manner, stipulated to be excluded from the limits of

any state, by treaty provision, in force at the date of the admission of Kansas into the union.

Third. It is argued that the petition was demurable, by reason of the fact that the writ of attachment, as set out in it, does not appear to have the seal of the court attached. The petition alleged that the writ "was issued out of and under the seal of the court," and that allegation needed no support by further description, whether in the language of the pleader or of the process described. If, in fact, the writ was not under seal, and that irregularity was relied on as a defense, the fact should have been set up by answer.

Fourth. It is insisted that the sheriff's bond sued on is not a statutory bond, because its conditions are, "that the said Green D. Todd shall faithfully perform the duties of such sheriff, as aforesaid, and faithfully demean himself in office, pay over all moneys that may come to his hands, by virtue of said office, according to the lawful direction of the same, and in all things act according to law;" while the conditions prescribed by law, (*stat.* 1855, *p.* 714,) were, "that he will faithfully collect and pay over all moneys entrusted to him for collection, and account for all moneys coming into his hands, and faithfully and impartially demean himself in office." There is no difference, in substance and legal effect, between the conditions of this bond and those of the statute. The plain meaning of the statute, without addition or restriction, is expressed in the bond, but in other and much better language. It is, therefore, a statutory bond. (*Farrar vs. Brown,* 5 *Peters,* 388; *Dutton vs. Kelsey,* 2 *Wend.,* 616; *Miltenberger vs. Schlegel,* 7 *Barr,* 251; *Skellinger vs. Yendes,* 12 *Wend.,* 308.)

The first section of the act, under which Todd was elected, provides that "the sheriff shall, when elected, be commissioned by the governor, and shall take the oath of office prescribed by law, which shall be indorsed on his commission, and the same, so indorsed, shall be recorded in the office of

the recorder of the county, and such sheriff, before entering on the duties of his office, shall give bond, to be approved by the probate court, in a sum not less than two thousand dollars nor more than fifty thousand dollars, as may be prescribed by the said probate court, conditioned," &c., &c. And it is claimed by counsel for defendant in error, that the petition is fatally defective, as to the sureties, for want of the allegation that the amount named in the bond (ten thousand dollars) was prescribed by the probate court, and the bond approved by it.

After careful consideration of the subject, we are of the opinion that the sureties could not take advantage of the omission to have the bond approved, and its amount prescribed by the probate court. They designated the amount, within the statutory limits, for which they were willing to become liable, and the deposit of the bond for record was delivery. The purpose of the law in requiring the action of the court upon the bond was clearly and solely to secure those who might suffer, as did McCracken, by the sheriff's default; or misconduct in office, and not at all to secure him, or his sureties. Todd was sheriff from the date he accepted his commission, and his neglect, or that of the court, to have the bond approved, did not vacate the office. (8 *Ind.*, 134.) His official acts, notwithstanding such failure, were binding and effectual. To allow the sureties, who had executed and delivered the bond, and who could not be prejudiced by the want of approval, to escape the liability they intended to assume, would wrest the law from its plain purpose. It would make the provisions, intended as public safeguards, the frequent and ready means of shielding from responsibility the sureties of any officer who might dishonestly or carelessly disregard them. Our opinion on this question is fully sustained by authority. (*Jones vs. The State*, 7 *Mo.*, 81; *Skellinger vs. Yendes*, 12 *Wend.*, 306; *Maupleman vs. Commonwealth*, 7 *Barr*, 246; *Davis vs. Hayden*, 3 *Scam.*, 35; *Ring*

McCracken *v.* Todd.

*vs. Gibbs,* 26 *Wend.,* 502; *Dutton vs. Kelsey,* 2 *Wend.,* 615; *Church vs. Clark,* 7 *Blackford,* 570.)

Sixth. Finally, it is objected that the petition does not allege that McMeekin's appointment as deputy sheriff was approved by the probate court. (*See Stat.* 1855, *p.* 713, § 6.) It is a sufficient answer to this objection that the thirteenth section of the same act confers on the sheriff "all the authority, power and privileges usually conferred on officers of a similar character." By the common law, expressly adopted here, (*Stat.* 1855, *p.* 469,) a sheriff could depute a person, who was not and could not have been appointed a general deputy, to do a specified official act. "An infant may be appointed to serve a particular writ, but cannot act as a general deputy. (1 *Salk.* 96; *Gwynne on Sheriffs, p.* 43, *and cases cited.*) The appointment of McMeekin as deputy, and the delivery of the writ of attachment to him by the sheriff, were sufficient authority to him to serve the writ. Hence, it is necessary to consider whether the sureties would be bound by the acts of McMeekin, as a general deputy, without approval of his appointment.

The demurrer, therefore, should have been overruled.

Ordered by the court, that the judgment in this case be reversed and the cause be remanded to the district court, with instructions to overrule the demurrer.