# TERRITORY OF MONTANA, RESPONDENT, *v.* WILLIAM H. BURGESS, APPELLANT.

CRIMINAL LAW—*Murder on military reservation—Jurisdiction.*—The defendant was tried in the District Court of the Territory, and convicted of murder for killing a man on a military reservation, situated within the Territory of Montana. *Held,* that the District Court had jurisdiction of the crime.

SAME— *Verbal error in an instruction immaterial.*—The defendant, and the man whom he killed, had had a struggle for the possession of a mining claim known as the "Florence." In the testimony upon the trial, another mining claim adjacent to the "Florence," and known as the "Josephine," had been incidentally mentioned. In an instruction of the court to the jury concerning said struggle, the Florence Mine was by mistake designated as the Josephine. *Held,* that the error was only verbal, and could not have misled the jury to the defendant's prejudice.

SAME—*A party cannot object to his own instructions.*—An instruction, as to good character, was granted at the request of the defendant, to which, after the trial, he objected as being erroneous. Another instruction, correctly stating

the law as to reasonable doubt, had also been given to the jury. *Held,* that the two instructions, taken in connection with each other, were not erroneous; and that moreover, the defendant could not be allowed to complain of an instruction given at his own request.

SAME— *An instruction may be refused when another is given covering the same ground.* —Certain instructions, which correctly stated the law as to self-defense and threats, were requested by the defendant, but were refused. The court, however, had given other instructions to the jury, which correctly stated the law as to the very same points. *Held,* that there was no error in the refusal of the court to grant the said instructions of the defendant.

SAME— *Instruction as to the law allowing the guilty to escape rather than to punish the innocent, refused.* —The following instruction asked by the defendant was refused: "The policy of the law deems it better that many guilty persons should escape, rather than that one innocent person should be convicted and punished, so that, unless the jury after a careful and thorough consideration of all the evidence in the case, can say and feel that every material allegation of the indictment is proved beyond a reasonable doubt, the jury should acquit the defendant." All that portion of the instruction concerning the consideration of the evidence and reasonable doubt had been already embodied in the court's charge to the jury. *Held,* that no error was committed.

CRIMINAL PLEADING— *Indictment—Allegations sufficient to sustain conviction of murder.* —An indictment, under which the defendant had been convicted of murder in the second degree, after setting forth the venue of the crime, charged that the defendant, "with force and arms, in and upon one Dennis N. O'Brien, did feloniously, wilfully, and of his deliberate and premeditated malice, and of his malice aforethought, and with intent to kill and murder, make an assault," etc. It was objected that the indictment only charged manslaughter. *Held,* that the allegations were sufficient to embrace murder in the second degree.

CRIMINAL LAW— *Drinking of liquor by jurors—New trial refused.* —The defendant, after his conviction of murder, urged as a ground for a new trial, misconduct on the part of several members of the jury, in drinking intoxicating liquors. Several of the jurors, after the case had been submitted, took drinks of liquor. They were in charge of bailiffs at the time, however, the drinking was not in the jury-room, and no intoxication resulted. *Held,* that such drinking was not misconduct sufficient to justify a new trial.

SAME— *Expressions of opinions as to guilt or innocence of accused—New trial refused.* —After conviction, the defendant, to sustain his motion for a new trial, filed the affidavits of two persons; one of whom swore that the juror, Brassy, had expressed an opinion as to the guilt of the accused before the trial, and the other that the juror, Bowman, had also expressed such an opinion prior to his sitting on the jury. Both of the said jurors on their *voir dire* had stated that they had never expressed or formed an opinion concerning defendant's guilt or innocence. The two jurors were thereupon brought into court, sworn, and subjected to examination and cross-examination. They denied ever having expressed the opinion set forth in said affidavits. The motion for a new trial was denied. *Held,* that the denials of the jurors rebutted the statements of the persons making the affidavits, and that there was no error in denying a new trial.

SAME— *A remark held not to be an expression of opinion as to guilt or innocence.* — It was claimed that one of the members of a jury, prior to his selection as a juror, had said concerning the defendant: "If Burgess (the defendant) is the man who killed O'Brien, he is liable to be cinched plenty and sent over the road to the penitentiary." *Held,* that even if such a remark had been made, it could only be considered a speculation as to the result of the defendant's trial, and was not an expression of opinion rendering the juror incompetent.

*Appeal from the District Court, Fergus County.*

STATEMENT.

The defendant, William H. Burgess, was indicted for the murder of one Dennis O'Brien, by the grand jury of Fergus County, Montana Territory, and tried in the District Court of said county. At the time of the killing, both Burgess and O'Brien had been striving for the possession of a mining claim, known as the "Florence," situated on the military reservation of Fort Maginnis, which was within the limits of said county. Deceased was shot, upon the said reservation, by a rifle, fired from the Florence Claim by Burgess, who had gained possession of the said mine. The trial resulted in a verdict of guilty of murder in the second degree, and the defendant was sentenced to thirteen years' imprisonment in the penitentiary. He appealed. Instructions 17 and 18 requested by the defendant and refused, which are referred to in the opinion, were as follows:—

No. 17. The court instructs the jury, that if they believe from the evidence that on the tenth day of September, 1887, one Dennis N. O'Brien, in company with other persons, went with deadly weapons to the place where defendant was working, with the intent, then and there, with such weapons to assault the defendant and do him great bodily harm, and that in pursuance of such design, he did so assault defendant, and said O'Brien was killed by the defendant, if the jury find he was so killed, then the court instructs the jury, that such killing was justifiable, and they should find the defendant not guilty.

No. 18. The court instructs the jury, that if they believe from the evidence, that on the tenth day of September, 1887, Dennis N. O'Brien, in company with other persons, went to the mine where the defendant was working, with the intent to kill the defendant; that in so going they were armed with deadly weapons, and had the ability to carry out such intentions; and if the jury further believe that while in the act of carrying out such intent, the said Dennis N. O'Brien was killed by the defendant, if the jury find that he was so killed, then such killing was justifiable, and the jury should find the defendant not guilty.

*Henry G. McIntire,* and *Sidney H. McIntire,* and *Wade, Toole, & Wallace,* for Appellant.

The trial court misdirected the jury in material matters of law. There is nothing in the testimony to show that there was a struggle between the defendant and the deceased on the Josephine, or any other mine. (Thompson's Charging the Jury, p. 88, § 63, notes 1 and 7, and cases therein cited; Wharton's Criminal Pleading and Practice, § 794, et seq.; Wharton's Criminal Evidence, 8th ed. § 707, et seq.) The instruction in regard to the defendant's character is not a correct statement of the law, and was prejudicial to the defendant. The rule is that evidence of the defendant's good character should in all criminal cases be taken into consideration by the jury in determining the likelihood of his having committed the offense charged, and is not restricted to doubtful cases. (*People* v. *Ashe,* 44 Cal. 288; *People* v. *Bell,* 49 Cal. 485; *People* v. *Mead,* 50 Mich. 228, and cases therein cited; *Armour* v. *State,* 63 Ala. 178; *Remsen* v. *People,* 43 N. Y. 6; *Kistler* v. *People,* 54 Ind. 400.) Sections 326 and 327 of the Compiled Statutes, page 464, and section 1, page 67, of the Acts of the Fifteenth Session, require the court in a criminal case to instruct the jury, as to all matters of law applicable and pertinent to an issue, and every instruction given, and the giving of the same are deemed excepted to. "There is no such thing as plaintiff's or defendant's instructions. The instructions proceed from the court." (*Kennon* v. *Gilmer,* 5 Mont. 270; *Reynolds* v. *State,* 8 Tex. App. 412.) If the instruction incorrectly states the law, and is given by the court to the jury, it is error, and the error is not cured or waived by reason of the fact that the defendant may have requested the erroneous instruction to be given. Instructions 17 and 18, asked for by the defendant, and refused by the court, correctly state the law on the subject of self-defense against one who manifestly endeavors to commit a felonious assault upon the party killing. (*Monroe* v. *State,* 5 Ga. 85; *Lamar* v. *State,* 1 South. Rep. 354; *Lee* v. *State,* 21 Tex. App. 241; *Hunnicutt* v. *State,* 20 Tex. App. 642, and cases therein cited; Wharton on Homicide, 2d ed. § 480, and cases there cited.) Instruction No. 18 given was intended to enlighten the jury upon the defendant's theory

of resisting by force a felonious assault, but as the two instructions on this subject were refused by the court, this explanatory one had no force. The court erred · in refusing to give instructions 14, 17, and 18, which were asked for by the defendant. They contain a correct statement of the law of justifiable homicide or self-defense. (Comp. Stats. p. 506, § 32; *State* v. *Ferguson*, 9 Nev. 106; *People* v. *Batchelder*, 27 Cal. 70; Wharton's Criminal Law, §§ 405, 495; *Murray* v. *Commonw.* 79 Pa. St. 311; Wharton on Homicide, 2d ed. § 430, and cases there cited.) Instruction numbered 15 asked for by defendant should have been given. The doctrine of communicated threats in cases of homicide, as casting light upon defendant's belief and actions and the subsequent events, should have been stated to the jury. (*William* v. *State*, 22 Tex. App. 497, and cases there cited; *State* v. *Kennedy*, 7 Nev. 374; *Sims* v. *State*, 9 Tex. App. 586; *Campbell* v. *People*, 16 Ill. 17; *Stokes* v. *People*, 53 N. Y. 174; *Alexander* v. *State*, 25 Tex. App. 260, and cases there cited.) Instruction numbered 4 asked for by defendant, and refused by the court, should have been given. This is the first time to our knowledge that it has ever been refused when asked. It is the humane policy of our law, and of all criminal law, that many guilty persons should escape, rather than that one innocent person should be convicted and punished. (Sackett on Instructions, p. 473.) Under Compiled Laws, page 504, section 18, murder is defined as the unlawful killing of a human being with malice aforethought. Compiled Laws, page 505, section 21, separates the offense into two degrees. To constitute the offense under these statutes, the killing itself must be with malice aforethought, etc. The indictment does not charge this, it merely states that the assault and battery were made with malice aforethought, etc. The following authorities are cited on the proposition that this indictment is insufficient to support the verdict: 24 Pa. St. 286; 83 Pa. St. 131; 5 Mo. 379; 20 Mo. 58; 25 Mo. 326; 8 Yerg. 534; 8 Ohio St. 109, 307; 10 Ohio St. 459; 4 Green, 500; 27 Iowa, 402; 39 Iowa, 118; 50 N. H. 369; 49 Ind. 106; 54 Ind. 135; 59 Ind. 105; 39 Cal. 694; 10 Tex. App. 390; 13 Tex. App. 520; 33 Tex. 228; Bishop on Statutory Crimes, 471, 472, 473; *Leonard* v. *Territory*, 2 Wash. 381; *Shaffer* v. *State*, 22 Neb. 559; *Territory* v. *Young*, 5 Mont. 242. In

construing this indictment, the Criminal Practice Act should be followed. (Comp. Stats. p. 435, § 162; 3 Ind. 498; 37 Cal. 277; 39 Cal. 52.) The verdict of the jury was not supported by the evidence in the case. The shooting of O'Brien by Burgress was justifiable. (*Stokes* v. *People*, 53 N. Y. 174; *People* v. *Campbell*, 30 Cal. 312; *Territory* v. *Edmonson*, 4 Mont. 141, and cases there cited; *State* v. *Sloan*, 47 Mo. 604; *Sims* v. *State*, 9 Tex. App. 586.) The jury in this case was not competent, two of its number being biased. (*U. S.* v. *Upham*, 2 Mont. 170; *Territory* v. *Kennedy*, 3 Mont. 520.) Defendant's motion in arrest of judgment should have been sustained; the homicide having been committed on the Fort Maginnis military reservation, a place set apart for the use of, and then in the occupation of United States soldiers, it could only be tried in a United States court. Under the United States Revised Statutes, section 1891, Organic Act, page 30, the Constitution and all laws of the United States, not locally inapplicable, are to have the same force and effect in the Territories as elsewhere in the United States. United States Revised Statutes, section 5339, provides for the punishment of homicides committed within a fort, etc. To give these laws the same force and effect over the *locus in quo* of the homicide, as they would have in a State, no cession of jurisdiction from the Territory to the United States is necessary. During the territorial period, the jurisdiction of the United States over its forts, etc., situated within a Territory is necessarily paramount. (*Fort Leavenworth R. R. Co.* v. *Lowe*, 114 U. S. 526.) Under Revised Statutes, 1851, Organic Act, page 23, it has been held that exclusive jurisdiction of crimes committed in forts, etc., is within the federal courts. (*Franklin* v. *U. S.* 1 Colo. 42.) The giving force and effect of a territorial law, to a place wherein the United States laws are applicable, is inconsistent. (See, also, *Kio* v. *U. S.* 37 Fed. Rep. 333, and U. S. Rev. Stats. § 711.) In Wyoming it is held, that under the Organic Act, which is similar to that of Montana, such jurisdiction is exclusively within the federal courts (*Scott* v. *U. S.* 1 Wyom. 40); and that even in civil matters, the territorial courts have no jurisdiction over such places (*Brown* v. *Ilges*, 1 Wyom. 202); and that persons residing and carrying on business therein are not liable to territorial taxation. (*Moore*

v. *County Commrs.* 2 Wyom. 8.) If these places are not within the taxing power of the Territory, then they are not within the jurisdiction of the territorial courts. (See, also, the remarks of McCrary, J., in *U. S. v. Berry,* 4 Fed. Rep. 791, 792.) *Clay v. State,* 4 Kan. 54, and *U. S. v. Stahl,* 1 Woolw. 192, are not contrary to the above cases. In them the State jurisdiction was upheld, on the ground that no cession of jurisdiction by the State had been made to the federal government.

*W. E. Cullen,* Attorney-General, for Respondent.

About the only question presented by the record in this case, certainly the only one of importance, is the question of the jurisdiction of the court to try the case. The courts of the United States are courts of limited jurisdiction. In criminal matters they have no common-law jurisdiction, nor can they take cognizance of an offense of any grade without the express authority of statutory law. (1 Abbott's U. S. Practice, pp. 182, 192, 207, 278; *U. S. v. Wilson,* 3 Blatchf. 435; *U. S. v. Bevans,* 3 Wheat. 336, 386; *People v. Godfrey,* 17 Johns. 225–232.) In *U. S. v. McBratney,* 104 U. S. 621, it was held by Mr. Justice Gray, that the Circuit Court of the United States had no jurisdiction in the case of a murder of one white man by another on the Ute Indian reservation, both the defendant and the deceased being citizens of the State of Colorado, and the following cases sustain this view: *Painter v. Ives,* 4 Neb. 122; *Marion v. State,* 16 Neb. 358; 20 Neb. 233–246; *Clay v. State,* 4 Kan. 54; *McCracken v. Todd,* 1 Kan. 164; *U. S. v. Yellow Sun,* 1 Dill. 273; *U. S. v. Stahl,* 1 Woolw. 192. Jurisdiction was conferred upon the territorial courts over the area embraced in this reservation by the Act of Congress of May 26, 1864, and by what act of Congress has it been divested? Military reservations are established by executive order, and so far as my investigation has gone, without any statutory authority. The commanding officer of a military department recommends the establishment of a post, at a given point in the Territory, and a reservation therefor with certain boundaries. The secretary of war thereupon refers the matter to the interior department, to know whether there is any reason existing why the given area should not be set aside for the purpose named. If none seems to exist,

the matter is referred to the President, who thereupon proceeds to declare the same a military reservation, and the lands embraced therein are withdrawn from settlement by the general land office. (The Public Domain, p. 249. See opinion of Attorney-General Cushing in 7th Opinions of Attorneys-General.) Exception is taken to that portion of the instruction in which mention was made of the "Josephine" Mine. Without doubt the court inadvertently in the hurry, incident to the trial, wrote the word "Josephine" instead of the word "Florence." The testimony shows that the homicide grew out of a struggle between the defendant and the deceased, the one to obtain possession of, and the other to hold the Florence Mine. It would seem that there was another mine in the vicinity known as the "Josephine," mention of which is made in the record. No one was or could have been misled by this *lapsus linguæ.* As to the instructions objected to, given by the court at the request of the appellant, they may be bad, but having been given at the request of the appellant, he cannot now be heard to except to them. (Hayne on New Trial and Appeal, p. 372; *People* v. *Lopez,* 59 Cal. 362.) Exception is taken to the refusal of the court to give the fourteenth instruction asked for by the defendant. The court had already correctly instructed the jury with reference to the law of justifiable homicide. Besides, this instruction does not correctly state the law of justifiable homicide in defense of property. It leaves out of consideration the imminence of the danger, apparent or real, which is essential to the justification. (*People* v. *Gonzales,* 71 Cal. 569, 577; *Territory* v. *Corbett,* 3 Mont. 50.) As to the seventeenth and eighteenth instructions asked for by the defendant, these two instructions are merely amplifications of the instruction already given by the court. (*Territory* v. *Corbett,* 3 Mont. 50; *People* v. *Varnum,* 53 Cal. 630.) The fifteenth instruction asked for by defendant, and refused by the court, does not attempt to explain to the jury the relevancy of the evidence as to threats made by the deceased and communicated to the defendant. There was no error in refusing to give to the jury defendant's instruction numbered 4, copied *verbatim* from Sackett, and intended to be universally applicable to all criminal cases. There is no such principle of law as therein enunciated, and if there were, a refusal to give it would not be

error. No instruction should be given to a jury, which is not predicated upon some evidence which has been introduced on the trial. (*People* v. *Sanchez*, 24 Cal. 28; *People* v. *Byrnes*, 30 Cal. 207; *People* v. *Atherton*, 51 Cal. 495.) The appellant claims that the indictment charges at most only the crime of manslaughter; that under our statute the killing itself must be with malice aforethought. The indictment is a good indictment for murder in the first degree at common law, and the question of its sufficiency under our statute has already been determined in this court. (*Territory* v. *Stears*, 2 Mont. 325; *Territory* v. *McAndrews*, 3 Mont. 158; *Territory* v. *Young*, 5 Mont. 243; 1 Wharton's Precedents, 115; *Territory* v. *Halliday*, 17 Pac. Rep. 118; *Fouts* v. *State*, 8 Ohio St. 124, dissenting opinion of Swan and Brinkerhoff.) The defendant did not see fit to raise this question in the court below, either on the trial or in his motion in arrest of judgment, and as long as the indictment alleges an offense, he cannot object here to its sufficiency for the first time. (*Territory* v. *Carland*, 6 Mont. 14.)

DE WOLFE, J.—The defendant was tried and convicted of murder in the second degree, for killing Dennis O'Brien on the tenth day of September, A. D. 1887, and sentenced to imprisonment in the territorial prison for thirteen years. The defendant moved for a new trial on several grounds: *First*, misconduct of the jury, tending to prevent a fair and due consideration of the case, to wit, the drinking by the jury of intoxicating liquors after being charged by the court, and while considering their verdict; *second*, the court misdirected the jury in material matters of law, in this, in giving the instructions it did give, and in refusing the instructions asked by the defendant; *third*, the court excluded legal evidence on the trial of the cause; *fourth*, the verdict is contrary both to the law and the evidence; and, *fifth*, the defendant did not have, and was not tried by, a competent jury, as required by law, in this, that two of the jurors in said cause had formed and expressed an opinion as to the guilt of the defendant, prior to his examination on the *voir dire*, and on said examination stated that they had not formed or expressed such opinion, and were therefore accepted as jurors. The motion for a new trial was based upon a bill of exceptions,

affidavits filed in said cause, and on the minutes of the court, all of which are contained in the record. The motion for new trial was overruled, upon which the defendant, by his counsel, filed a motion in arrest of judgment, on the ground: *First.* That the grand jury, which found the indictment, had no legal authority to inquire into the offense charged, by reason of its not being within the jurisdiction of said court, said offense having been committed within the exterior boundaries of the Fort Maginnis military reservation; the same being a reservation set apart for the use of and occupied by the military forces of the United States, and not within the jurisdiction of the said county of Fergus. *Second.* The court had no jurisdiction of said offense, the same having been committed within the Fort Maginnis military reservation, and not within the jurisdiction of the county of Fergus. The motion in arrest of judgment was overruled, and judgment pronounced in accordance with the verdict of the jury. To reverse this judgment this appeal is prosecuted.

We will consider the alleged errors of the court in the inverse order in which they appear in the record and in the brief of the appellant, first examining the question of the jurisdiction of the court, raised by the motion in arrest of judgment. It is conceded in argument, and in the briefs on file, that the offense charged in the indictment was committed on the Fort Maginnis military reservation, although the indictment itself does not allege this, but charges the crime to have been committed in the county of Fergus. Section 5339 of the United States Revised Statutes prescribes, "that every person who commits murder within any fort, arsenal, dock-yard, magazine, or any other place under the exclusive jurisdiction of the United States, shall suffer death." In giving a construction of this provision of law, we should not lose sight of the fact, that in one and the fullest sense of the term, the United States possesses sovereignty over the Territories of the United States, so long as they exist under territorial governments; that their powers of government, and the jurisdiction of the courts established in the Territories, are only such as are authorized under the act creating the government of the Territory. From this it is (with much reason) urged, that the courts of a Territory owe their jurisdiction and existence to the government which created them; and, although

not held to be courts contemplated by, or established under, the provisions of the Constitution defining the judicial powers of the United States, they are nevertheless courts established by an act of Congress, under and by virtue of the supreme power of the government over the Territories of the United States. In this view, the courts of the Territory may, in a strict sense, be held to exercise their powers under the authority conferred by the act of Congress, and, when jurisdiction is conferred upon them, whether by Congress or the local legislature, they continue to exist, and exercise whatever jurisdiction they possess, under the sovereign power which created them; and when exercising the jurisdiction authorized by law, it is not to the exclusion of the United States, but rather to the maintenance and assertion of its jurisdiction. Hence it is claimed by the respondent, that the District Court of Fergus County, in trying the defendant, in no way transcended its jurisdiction. The appellant, on the contrary, contends that, as the offense charged in the indictment was committed on a military reservation, it could be tried only in a District Court, when sitting for the trial of causes arising under the Constitution and laws of the United States; the claim being that the United States, by virtue of section 5339 of the Revised Statutes above referred to, had the exclusive jurisdiction of the offense charged. Counsel for appellant have cited a number of cases in their brief, which we will consider before examining the cases appearing to hold the contrary doctrine. The first case is that of *Fort Leavenworth R. R. Co.* v. *Lowe,* 114 U. S. 525. It was an action by the railroad company to recover back certain taxes paid to the State of Kansas, on the ground that property situated on a military reservation was not subject to State taxation, the United States having exclusive jurisdiction. The court held the law of the State valid, and not in conflict with the jurisdiction of the United States; the State, at the time of its admission into the Union, and by the terms of the cession of the military reservation of Fort Leavenworth, expressly reserving the "right to tax railroad, bridge, and other corporations, their franchises and property on said reservation." This certainly is not an authority in support of the proposition contended for by the appellant. The next case is that of *Franklin* v. *U. S.* 1 Colo. 42. In this case the defendant was indicted,

tried, and convicted of the crime of murder, in the District Court of Gilpin County, Colorado. A plea to the jurisdiction of the court was interposed on the ground that the Territory of Colorado was a district of country under the exclusive jurisdiction of the United States, and for this reason the offense was triable only in a court of the United States. The plea to the jurisdiction was sustained in the District Court, but reserved on appeal to the Supreme Court. The case, like the former one, is not in point. The next case is that of *Scott* v. *U. S.* 1 Wyom. 40. The defendant was tried and convicted of murder committed on the Fort Steele military reservation. The trial was in a District Court, sitting as a Circuit Court of the United States, for the trial of causes arising under the Constitution and laws of the United States. After conviction, a motion for a new trial was made, on the ground that the court which tried the cause had not jurisdiction to try it, and because the United States had not exclusive jurisdiction of the military reservations within the Territory of Wyoming. The court overruled the motion for a new trial, and affirmed the judgment of the trial court. The principles of law involved in that case were exactly the same as that now under consideration, the difference being that in the Wyoming case the defendant was tried in a so-called "Circuit Court of the United States," while in the case at bar he was tried in a District Court of the Territory, sitting in the county of Fergus. If the decision in the Wyoming case is correct, it is a direct authority for the proposition contended for by the appellant, that the District Court of Fergus County had no jurisdiction to try him for the offense charged; and this proposition will be considered, after referring to some authorities cited by the respondent, as holding a contrary doctrine to that maintained by the appellant, and sustained by the above decision of the Supreme Court of Wyoming. We are also referred by the appellant to the case of *Brown* v. *Ilges,* 1 Wyom. 202. This was an action brought by a civilian against a military officer, for the seizure and detention of certain animals belonging to the former, and which had strayed upon a military reservation, contrary to orders issued by the commandant of the post. The court merely held that it was competent for the officer in charge to make the order in question, and that an action did not lie

against him for the seizure of the property. This can hardly be considered a case determining the jurisdiction of a territorial court, though it may have some bearing on the question of the exclusive jurisdiction of the United States on a military reservation. It is not, however, decisive of that question.

The only other case referred to by appellant under this head is that of *Moore* v. *Commrs.* 2 Wyom. 8, in which it was held that it was beyond the power of the Territory to tax the property of a person situated on an Indian reservation, the property being there under the license and authority of the United States. The court, by its opinion, showed conclusively that the United States, by treaty with the Indians, reserved the territory embraced in the reservation for the exclusive use of the Indians, and such persons as it should authorize or permit to go there for the purpose of furnishing food and supplies to the Indians. The treaty had the force and effect of law; and the exclusive control over the reservation is contained in the treaty. In the case of *U. S.* v. *McBratney*, 104 U. S. 621, tried in the Circuit Court of the United States for the district of Colorado, and which went to the Supreme Court of the United States on a certificate of division of opinion of the judges of the Circuit Court, it was held by the Supreme Court that the Circuit Court of the United States for Colorado had no jurisdiction of an indictment against a white man for the murder of a white man within the Ute reservation, in the State of Colorado. The court, in its decision, quotes section 2145 of the United States Revised Statutes, as follows: "The general laws of the United States as to the punishment of crimes committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country." Notwithstanding this statute, the court held that "the State of Colorado, by its admission into the Union upon an equal footing with the original States in all respects whatever, without any exception as had been made in the treaty with the Ute Indians, and in the act establishing a territorial government, has acquired criminal jurisdiction over its own citizens, and other white persons, throughout the whole of the territory within its limits, including the Ute reservation; and that reservation is no longer within the sole and exclusive jurisdiction of

the United States. The courts of the United States have therefore no jurisdiction to punish crimes within the reservation, unless so far as may be necessary to carry out such provisions of the treaty with the Ute Indians as remain in force; but the treaty contains no stipulation for the punishment of offenses committed by white men against white men. It follows that the Circuit Court for the district of Colorado has no jurisdiction of this indictment, but, according to the practice heretofore adopted in like cases, should deliver up the prisoner to the authorities of the State of Colorado, to be dealt with according to law; referring to the cases of *U. S.* v. *Cisna*, 1 McLean, 254; *Coleman* v. *Tennessee*, 97 U. S. 509." The court in conclusion says: "The single question presented by the record is, whether the Circuit Court of the United States for the district of Colorado has jurisdiction of the crime of murder, committed by a white man upon a white man within the Ute reservation, and within the limits of the State of Colorado; and that question is decided in the negative." The cases of *Painter* v. *Ives*, 4 Neb. 122, and *Marion* v. *State*, 16 Neb. 358, are to the same effect, holding that a Circuit Court of the United States had no jurisdiction of the crime of larceny, alleged to have been committed on an Indian reservation in the State of Nebraska, and that the State courts had jurisdiction. The doctrine of these cases was affirmed by the same court in *Marion* v. *State*, 20 Neb. 246. The same principle is laid down by the Supreme Court of Kansas, in the case of *Clay* v. *State*, 4 Kan. 54, and in *McCracken* v. *Todd*, 1 Kan. 164.

In the case of *U. S.* v. *Stahl*, 1 Woolw. 192, the defendant was indicted for murder committed at Fort Harker, on a military reservation belonging to the United States. The defendant pleaded to the jurisdiction of the court, to which a demurrer was interposed. Mr. Justice Miller, of the Supreme Court of the United States, overruled the demurrer, thus sustaining the plea to the jurisdiction of the court. Yet this was a crime committed within a fort of the United States. It is to be remarked that in most or all of the cases above referred to, which deny the jurisdiction of the courts of the United States, the decision of the courts is based upon the fact that the States

in which the question of jurisdiction arose were admitted into the Union upon "an equal footing in all respects with the original States," and that, by the terms of such admission, the United States did not reserve exclusive jurisdiction over the forts and military reservations which it previously possessed within the boundaries of the State thus admitted, holding, also, as inapplicable to these cases, that provision of the Constitution of the United States which empowers Congress "to exercise exclusive jurisdiction in all cases whatsoever, over such district (not exceeding ten miles square), which may by cession of particular States become the seat of government of the United States; and to exercise like authority over all places purchased by the consent of the legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings." The cases, as has been seen, all grow out of conflicts between the jurisdiction of the State and federal courts. They therefore shed but little light upon the immediate question we are called upon to decide, which is as to the jurisdiction of one or the other branch of the territorial courts. Unfortunately the case of *Scott* v. *U. S.* 1 Wyom. 40, which seems to be about the only case where the question under consideration has come before the Supreme Court of a Territory, was decided apparently without much consideration, the court giving no reasons for the conclusions reached, and seeming to assume, without question, that the District Court, while sitting as a Circuit Court of the United States, had exclusive jurisdiction to try the offense charged in the indictment. With great deference to the decision of the Supreme Court of an adjacent and sister Territory, we have come to an opposite conclusion, and will briefly state the reasons of our dissent.

The Organic Act, after designating what courts shall exist in a Territory, declares, in section 1866 of the United States Revised Statutes, that "the jurisdiction, both appellate and original, of the courts provided for in sections 1907 and 1908 shall be as limited by law." And again, in section 1868, the act declares that the Supreme and District Courts, respectively, of every Territory, shall possess chancery as well as common-law jurisdiction. The legislative power of the Territory extends to all rightful subjects of legislation, not inconsistent with the Consti-

tution and laws of the United States. (U. S. Rev. Stats. § 1851.) Under these comprehensive grants of legislative and judicial powers, the legislature has conferred upon the District Courts of the Territory jurisdiction in all criminal cases not otherwise provided for. (Comp. Stats. Mont. § 700.) And again, section 30 of the Criminal Practice Act provides, that all offenses committed against the laws of the Territory shall be tried in the county in which the offense is committed, or in that county to which it is attached for judicial purposes, except as otherwise provided by law. The jurisdiction thus conferred is amply warranted under the organic law; and, unless it can be shown to be in conflict with, or repugnant to some act of Congress, is valid and binding. The appellant insists that it is in conflict with section 5339 of the United States Revised Statutes before referred to; but we are cited to no authority or construction by any department of the government, which holds that the mere occupancy and use of a portion of the public domain as a military reservation, of itself, divests the territorial law, or the territorial courts, of operation within the Territory thus reserved. Certainly, the laws enacted by the Territory, if warranted by the Organic Act, have force and effect throughout the Territory, unless limited in their operation by some paramount law or authority. So, also, with the jurisdiction conferred upon the courts. This conflict must be apparent, and not merely conjectural, before this court would be justified in holding the laws enacted by the legislature, and the jurisdiction conferred upon its courts invalid; the rule of construction being that laws duly enacted are constitutional and valid, unless the repugnancy of the law to some constitutional principle is plainly manifest. "The constitutionality of a law is to be presumed until its violation of the Constitution is proved beyond a reasonable doubt." (Cooley on Constitutional Limitations, 221.) The same presumption applies to a law of a Territory; and unless it manifestly conflicts with some paramount law or constitutional provision, it is the duty, at least of this court, to uphold the laws enacted by the territorial legislature. We are not able to discover any repugnancy between section 5339 and the jurisdiction conferred by the legislature upon the District Courts. It will be observed that section 5339 of the Revised Statutes does

not, in express terms, declare that a military reservation is a district of country under the exclusive jurisdiction of the United States, and we are referred to no law or construction by any court, or by any branch of the executive department of the government, which holds that the United States has such exclusive jurisdiction as to render inoperative the laws and the jurisdiction of the courts of a State or Territory in which such military reservation is situated; while, on the contrary, the reservation of a given portion of the public domain for military purposes by the United States in no way interferes or conflicts with the extension and operation of the local law, and the jurisdiction of local courts over the military reservation. In this respect there may be, and doubtless is, a divided jurisdiction; the United States occupying the reservation for military purposes only, while the local government occupies it for the purposes of civil government and the administration of its laws.

In volume 7, page 574, of the Opinions of the Attorney-Generals, Mr. Cushing, attorney-general of the United States, speaking of the military reservations, says: "A military reservation is an act of the President, under authority of law, withdrawing so many acres of the public domain from the immediate administration of the commissioner of the public lands, that is, from sale at public auction, and by pre-emption or general private entry, and appropriating it, for the time being, to some special use of the government." And on pages 563 and 564 of the same volume says: "The fact that a crime is committed upon a military reservation established within a Territory does not give the federal courts jurisdiction of such crime, but the same remains within the jurisdiction of the territorial courts." This opinion of an eminent lawyer, speaking in his official capacity as the highest law officer of the government, fully sustains the position taken in this opinion; and, in the absence of a direct adjudication holding to the contrary, must be deemed controlling. If such is not the correct construction of law, the laws themselves, and the jurisdiction of the territorial courts, are as shifting and uncertain as the movement of the military forces of the government, which, as we know, occupy and abandon by turns portions of the public domain, as military necessity or convenience requires; and, as was well said by the

Supreme Court of Kansas, in *Clay* v. *State:* "If the doctrine contended for were true (the exclusive jurisdiction of the United States over military reservations), the State of Kansas, as well as several other frontier States, would be speckled and spotted all over, like the patriarch's flocks, with reservations exempt from State jurisdiction, without the consent of the State legislature, with no warrant for their anomalous existence, except, perhaps, an order from the war department, and actual occupation for military purposes." We think, also, that there is much force in the proposition contended for by the attorney-general of the Territory, that the courts of the Territory derive their existence and jurisdiction from an act of Congress; and if this jurisdiction has not been taken from them, they still possess it. But this, with other questions growing out of it, it is not necessary to decide in this case, and we prefer resting our discussion upon the grounds stated: that the jurisdiction of the United States over a military reservation is not exclusive, and does not deprive the territorial laws and courts of the jurisdiction conferred on them by law; and that the District Court of the Fourth District, in and for the county of Fergus, had jurisdiction to try the defendant for the offense charged in the indictment.

The record also presents exceptions, and alleges error by the court in giving and refusing certain instructions to the jury. These we will consider in the order in which they appear in the brief of the appellant. One of the instructions excepted to by the defendant is that in which the court instructed the jury, "that if they believed from the evidence there was a struggle between O'Brien, on the one side, and the defendant on the other side, to gain sole possession of the Josephine Mine, each determined to drive the other off, and that defendant shot and killed deceased, O'Brien, in furtherance of such struggle, he could not be justified upon the ground of self-defense." The objection urged against this instruction is, that there was no testimony showing that there was any struggle between the defendant and the deceased concerning the Josephine Mine, but the contest between them was as to the possession of the Florence Mine; but the Josephine Mine had been incidentally mentioned, by some of the witnesses, as a mine adjacent or contiguous to the Florence Mine, and the court, or person who drew the instruc-

tion, made the mistake of calling the Florence the Josephine Mine. The error was only a verbal one, and could not have misled the jury; certainly not to the defendant's prejudice.

The second instruction to which exception is taken is as to evidence of good character, and was as follows: "That when there is a serious conflict in the testimony as to the commission of an offense like that in this case, evidence of the previous good character of the defendant should be considered by the jury, in connection with all the other evidence given on the trial, in determining whether the defendant would be likely to commit, and did commit, the offense in question. That in doubtful cases, evidence of good character is conclusive in favor of the party accused; and if, from the evidence, you find the facts and circumstances proved or relied on to establish the defendant's guilt are in doubt, or that the intent of the defendant to commit the crime is in doubt, then, if the prisoner has by evidence satisfied you that he was a man of good character up to the time of the alleged offense in this case, the presumption of the law is that the alleged crime is so inconsistent with the former life and character of the defendant, that he could not have intended to commit such a crime; and it would be your duty to give the defendant the benefit of that presumption, and acquit him." This instruction was given at request of defendant's counsel, and is now by them complained of as erroneous. We will not assume that the instruction is not faulty, or that it states with correctness the rule of law applicable to evidence of good character. Doubtless the rule is, as claimed by counsel for appellant, that evidence of the good character of the defendant should be considered by the jury as they do other facts in evidence; and, taking it into consideration with other evidence, if they are not satisfied of the defendant's guilt beyond a reasonable doubt, they should acquit. But if the instruction was subject to objection, was it unfavorable to the defendant, or did it operate to his prejudice with the jury? We think not. All the evidence offered was in favor of the previous good character of the defendant as a peaceable citizen, and the court in substance instructed the jury that this proof of good character should lead them to acquit, if there was any doubt as to his guilt.

In another part of the charge the court instructed the jury as

follows: "The court instructs the jury that in this case the law raises no presumption against the prisoner, but every presumption of the law is in favor of his innocence; and, in order to convict him of the crime alleged in the indictment, or any lesser crime included in it, every material fact necessary to constitute such crime must be proved beyond a reasonable doubt. And if the jury entertain any reasonable doubt upon any single fact or element necessary to constitute the crime, it is your duty to give the prisoner the benefit of such doubt, and acquit him." This instruction on the subject of a reasonable doubt was correct, and, taken in connection with the instruction as to character, was certainly not misleading, or prejudicial to the defendant. Besides, the defendant cannot complain of an instruction given at his own request. (*People* v. *Lopez*, 59 Cal. 362; Hayne on New Trial and Appeal, p. 372.)

Instruction numbered 18 in the transcript is copied from the territorial statute, and defines an assault, and is neither misleading nor erroneous.

The court refused to give instructions numbered 14, 17, and 18, contained in the record, and this refusal is assigned as error. The first of these instructions was as follows: "If the jury believe from the evidence that at the time of their (deceased and his companions) going to the accused, he was in the possession of the Florence Mine, and the deceased and such others as went with him had no right to approach the accused in a threatening manner, with weapons of a deadly character exhibited, and in a condition to be used; and, if the jury further believe from the evidence, or have a reasonable doubt therefrom, that the accused was so approached by the deceased and his companions, and fired from a reasonable apprehension that they were about to take his life, then they must acquit the defendant." Instructions 17 and 18 were substantially like the above, and disposing of the one recited will likewise dispose of the other two. This instruction is correct, and it would have been error in the court to refuse it, had it not given its exact substance in another instruction; but the court on this subject instructed the jury as follows: "The court instructs the jury that, where one without fault himself is attacked by another in such a manner or under such circumstances, as to found reasonable grounds for apprehending a

design to take away his life, or to do him some great bodily harm, and there is reasonable ground for believing the danger imminent, that such design will be accomplished, the defendant may safely act upon appearances, and kill the assailant, if that be necessary to avoid the apparent danger; and the killing will be justifiable, although it may turn out that there was, in fact, neither design to do him serious injury, nor danger that it would be done." The court also gave the following instruction: "The jury are instructed as a matter of law that, if a person believes, and has reasonable ground to believe, that another has sought him out for the purpose of killing him, or doing him great bodily harm, and is prepared therefor with deadly weapons, and the latter makes demonstrations manifesting an intention to commence an attack, then the person so threatened is not required to retreat, but he has the right to stand and defend himself from danger; and if in so doing it is necessary to kill his antagonist, the killing is excusable on the ground of self-defense." These two instructions state the principles of law in regard to self-defense in a light most favorable to the defendant; certainly as strong as they are asked in the instructions refused by the court. They furnish a substitute for those instructions, and the court committed no error in refusing to give the instructions asked, after giving the instructions above noted.

The defendant also asked, and the court refused to give, the following instructions: "If the jury believe from the evidence that on and before the day of the shooting the deceased made threats against the life of the defendant; that said threats were communicated to the defendant on and before the day of the shooting; and that, on the day of the shooting, the deceased and his companions came up the hill towards the ore-house of the Florence Mine [where the defendant then was], armed with deadly weapons, and that the defendant saw the deceased and his companions approaching him, and making hostile demonstrations with said deadly weapons, and the defendant shot at and killed the deceased [if the jury find from the evidence that the defendant did shoot and kill the deceased] under the apprehension that deceased and his companions came towards him armed for the purpose of taking his life, or inflicting on him grievous bodily harm, the killing of deceased by defendant was

justifiable homicide, and the jury must find the defendant not guilty." This instruction, so far as it related to the doctrine of self-defense, was fully covered by the instructions already referred to as given by the court. On the subject of threats the court instructed the jury as follows: "Neither the utterance of threats by the deceased, O'Brien, nor his presence on the premises referred to, with others, with shotguns and rifles, would by themselves justify the killing of the deceased by the defendant in self-defense. It must appear from the evidence that a reasonable man, under the same circumstances, would consider himself in danger of losing his life, or suffering great bodily injury; and it must appear that the shot was fired in self-defense." This instruction substantially states the rule of law applicable to cases of self-defense when a person acts in view of threats made by the deceased.

The remaining instruction refused by the court, and to which exception was taken, was as follows: "The policy of the law deems it better that many guilty persons should escape, rather than that one innocent person should be convicted and punished; so that, unless the jury after a careful and thorough consideration of all the evidence in the case can say and feel that every material allegation of the indictment is proved beyond a reasonable doubt, the jury should acquit the defendant." The latter part of this instruction was given by the court in another part of the charge to the jury, and it is doubtless to the refusal of the court to instruct the jury that the law deemed it better that many guilty persons should escape, than that one innocent person should suffer, that exception is taken. The well-known and well-worn maxim is doubtless creditable to humanity, but we are not aware that it has been adopted by courts as a legal proposition to be incorporated in a charge to a jury in a criminal trial. Like most other current maxims, it has a true as well as a false side, and may be tortured and construed to work harm as well as good. Fortunately, and to the credit of humanity, it is hardly required as a shield against injustice or prejudice, for a sense of justice and fair play is almost instinctive in the mind of man; and experience has shown that juries are much more inclined to show mercy towards the guilty than to punish the innocent. Although we find the maxim referred to

laid down as proper in Sackett's Instructions to Juries, he refers to no cases or authority where it has been held necessary, or even proper. Perhaps the statement in the brief of the appellant that no case is known where the instruction has been refused when asked could be answered by the statement that it is rarely or never asked.

Another alleged ground of error is that the indictment charges, at most, only the crime of manslaughter, whereas the defendant was convicted of murder in the second degree. The indictment charges the offense as follows: "That one William H. Burgess, late of the county of Fergus, on the tenth day of September, one thousand eight hundred and eighty-seven, at the county of Fergus, in the Territory of Montana, with force and arms, in and upon one Dennis N. O'Brien, did feloniously, wilfully, and of his deliberate and premeditated malice, and of his malice aforethought, and with intent to kill and murder, make an assault," etc. We know not how an assault with intent to kill and murder could be stated in language more explicit and exact than is here employed. Counsel for appellant has referred to a large number of cases which hold that the indictment must allege that the assault was made with malice aforethought, and with intent to murder; otherwise it is defective as an indictment for murder. Conceding this proposition, the allegations of this indictment do charge an assault, with intent to murder, and it is therefore sufficient. The defendant moved for a new trial in the court below, and one of the grounds of this motion was the alleged misconduct of the jury upon the trial. Affidavits were filed by different persons, setting forth that some of the members of the jury which tried the case, after being charged by the court, and retiring under the charge of an officer, went to a public bar, and drank whisky and other intoxicating liquors. To rebut the statements contained in these affidavits, the court examined orally and under oath several of the jurors who tried the case, all of whom testified that no juror who tried the cause was under the influence of intoxicating liquor from the commencement of the trial to the time they were discharged from the cause, and that no whisky or intoxicating liquor was drunk in the jury-room; but several of the members of the jury admitted taking a single drink. The bailiff in

charge of the jury also testified that none of the jurors were under the influence of liquor at any time while acting as jurors, and were never without the presence of the bailiff, and that there were two bailiffs in charge of the jury. The court, upon this evidence, held that no such misconduct had been shown on the part of the jury as would justify the court in setting aside their verdict, and granting a new trial. Without approving or sanctioning the action of these jurors in drinking intoxicating beverages, while engaged in the trial of an important criminal case, we cannot hold that the court erred in refusing to set aside their verdict on this account; no intoxication of any juror having been shown, nor any mental or other unfitness on account of the slight drinking some of the jurors indulged in.

Another ground of motion for new trial was that the defendant was not tried by a competent and impartial jury; that two of the jurymen who tried the cause, to wit, Edward Brassy and B. H. Bowman, in the preliminary examination touching their qualifications as jurymen, stated that they had never formed or expressed an opinion as to the guilt or innocence of the defendant, and were, upon said statement, accepted as jurymen. The defendant files the affidavits of W. A. Burleigh, Henry G. McIntire, and S. H. McIntire, to the effect that the jurors mentioned did so swear on examination on their *voir dire*, and there are no affidavits to the contrary. The defendant also files the affidavit of Neilson Jensen, in which he states that he had a conversation, about the 25th of April, 1888, in Lewistown, in which Brassy said: "If Burgess is the man who killed O'Brien, he is liable to be cinched plenty, and sent over the road to the penitentiary." Also the deposition of Florence Clegg was filed, in which she states that she was in the town of Lewistown about the 1st of October, 1887, and in the store of W. W. De Witt, overheard B. H. Bowman talking with several men about the case of defendant, and heard Bowman use the following words: "That damned Burgess, the son of a bitch, ought to be hung;" and that Bowman was one of the jurymen that tried the cause. The foreman, Brassy, was afterwards sworn, and examined as to having had any conversation with Neilson Jensen about the case against the defendant for killing O'Brien, and in said examination testified as follows: "I have read the

affidavit of Neilson Jensen, filed on this motion. That affidavit is not true. I never had such a conversation with him or any one else. Had never expressed or formed any opinion of this case before I was sworn as a juror. Had never heard any account of the facts. Have seen the account contained in the Fergus County Argus; but all I remember now, or did remember when I was examined as a juror, was an announcement of the killing. I knew Mr. Burgess very slightly before the trial. Never knew O'Brien, the deceased, except by sight; never spoke to him. Have written to him about school. He was, I think, school clerk." In response to a question asked him by counsel for defendant, he stated: "I am sure that I never had any conversation with any one about this case, prior to my examination as a juror, at which I expressed an opinion. I may have talked about it with my neighbors at the time the account was printed in the paper. I cannot detail any conversation with my neighbors about the case." Here is a full and explicit denial of ever having used the language attributed to him in the affidavit of Jensen, and a denial also of having formed or expressed an opinion about the case prior to being sworn as a juror. The affidavit of the juror is to be taken as true, as well as the affidavit of Jensen, and he was quite as competent to testify as to the facts of what he had said as the latter. In this view of the matter, one affidavit is offset by the other. It is also to be observed, that if he did use the language which Jensen said he did, it was not an expression of an opinion as to the guilt or innocence of the defendant. The statement which Jensen alleges he made was: "If Burgess is the man who killed O'Brien, he is liable to be cinched plenty, and sent over the road to the penitentiary." This was rather a speculation as to what might be the result of the trial, and evinces no enmity against Burgess, or belief as to his guilt or innocence; and if he uttered it, would not, under the statute, render him incompetent as a juror.

B. H. Bowman, the juror charged in the affidavit of Florence Clegg with having used the expression mentioned in her affidavit, was also examined orally and under oath, by the court, as to the use of the language attributed to him, and testified as follows: "I have read the affidavit of Florence Clegg, filed and read upon this motion. I never used the expression contained

therein, and therein alleged to have been made by me. On October 1, 1887, I was not in Lewistown. I was confined to my room, about seven miles from Lewistown, from prior to October 1st until the last of October, by a wound caused by the bursting of a gun. . . . . My brother arrived from the East about September 25, 1887, and I was hurt soon after that. About two days after his arrival I came to Lewistown. Did not come after that until the latter part of October, 1887. When I came to Lewistown, two days after my brother arrived, I do not remember of meeting Mrs. Clegg, and I did not go at that time to the store of W. W. De Witt, in Lewistown. I had never formed or expressed any opinion concerning this case prior to its trial; had never heard any of the facts, except such as were in the Fergus County Argus, which was an announcement of the occurrence only." As in the case of the juror Brassy, here was an explicit denial of ever having used the language attributed to the juror; with the further statement that he had never formed or expressed any opinion concerning the case prior to its trial. The juror also states facts showing that he was not in Lewistown at the time stated in the affidavit of Mrs. Clegg. The statement of the juror, made under oath, is presumably entitled to as much weight as the statement of Mrs. Clegg, and the facts must have been as much within his knowledge as in the case of the former juror. The conflicting statements rebut one another, and they therefore stand, in this respect, as if no expression had been charged against the juror. In another view, these contrary statements rest upon a somewhat different footing. The affidavit was *ex parte*, while the juror was examined openly in court, and was interrogated by counsel for defendant as well as by the court. The court had a full opportunity to see the demeanor of the witness, as well as to hear his words, and from both was doubtless convinced of the sincerity and truth of his statement; otherwise the court would not have overruled the motion for a new trial. In this we cannot say that any error or abuse of judical discretion was committed. We are referred to the cases of *U. S.* v. *Upham*, 2 Mont. 170, and *Territory* v. *Kennedy*, 3 Mont. 520, as holding a contrary doctrine to that now advanced. But the facts in both those cases were unlike the one now under consideration. In the case

of *U. S.* v. *Upham* there was no-denial by the juror, or any one else, that the juror had expressed an opinion, or at least used language indicating an opinion, as to the guilt of the defendant. The juror himself denied, under oath, that he had formed any opinion, but did not deny using the language he was charged with using, and said that it was uttered in jest or sport. In this state of facts the court held that the juryman was incompetent, and for this reason reversed the judgment, and awarded a new trial. Judge Knowles rendered a dissenting opinion in the case, which, from the facts before the court, we deem a better view of the law. But the facts of the case being so unlike the present case, it can hardly be regarded as an authority. In the case of *Territory* v. *Kennedy* the facts were also very different from the case now decided. In that case the juror, Douglas, on his *voir dire* examination, testified that he had not formed or expressed an opinion as to the guilt or innocence of the defendant. On a motion for a new trial two affidavits were filed, in one of which the juror was charged with saying, among other things connected with the offense charged against the defendant, that he (Douglas) believed said Kennedy (the defendant) to be guilty of killing said O'Conner. The other affidavit also charged the juror, Douglas, with using very hostile language towards the defendant, and among other things, of saying that he would hang him (said Kennedy), or any other man who would do what Kennedy did in shooting said O'Connor. Upon an examination in open court, Douglas, the juror, did not deny using the language he was charged with using in these affidavits, but said he had forgotten it at the time he was examined as a juryman, and at the time had no opinion as to the guilt or innocence of the defendant. Thereupon the District Court or judge refused to grant a new trial. But the Supreme Court, on appeal, reversed this ruling on the express ground that the juror was incompetent on account of having expressed an opinion, and was not such a juryman as the law contemplated. This, like the former case, can hardly be considered as an authority in the present case, the facts are so unlike. In both these cases the fact that the juror had expressed an opinion prior to the trial, and before being accepted as a juror, was undisputed, the only question in the first case being whether the opinion was expressed

in jest or in earnest; while in the latter, the juror, on his examination on his *voir dire*, forgot that he had expressed the opinions charged in the affidavits, but afterwards did not deny having done so. In the present case the juror, Bowman, positively denies ever using the language he is charged with using in the affidavit of Mrs. Clegg, and denies having formed or expressed any opinion as to the guilt or innocence of the defendant prior to the trial; and there is nothing to contradict or rebut his statement but the affidavit of Mrs. Clegg.

In this connection it is not improper to say that the temptation is strong on the part of a defendant who has been convicted in a criminal case, and particularly on the grave charge of murder, to try and obtain a new trial on the two grounds alleged in this case—of misconduct of the jury, and the incomptency of a juror by reason of having expressed an opinion in the case. These, when the facts clearly establish the misconduct in the one case, or the expression of an opinion by a juror in the other, are plainly sufficient grounds for granting a new trial. But, in view of the temptation on the part of the defendant, and also on the part of his friends, to obtain a rehearing in the case of conviction, and in view, also, of the facility with which affidavits for this purpose can be obtained, courts should closely scan affidavits procured for that end; and, unless convinced of their correctness, should not be influenced by them in granting a new trial, and this, we think, has been the action of the District Court in the present case. Finding no error in the record, the judgment of the District Court should be affirmed.

*Judgment affirmed.*

McCONNELL, C. J., and LIDDELL, J., concur.